## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **GLORIA J. BRYANT,** | ) | |
| Plaintiff | ) | Civil Action No. 2:20cv00020 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **KILOLO KIJAKAZI,**[1] | ) | By: PAMELA MEADE SARGENT |
| **Acting Commissioner of Social** | ) | United States Magistrate Judge |
| **Security,** | ) | |
| Defendant | ) | |

### I. Background and Standard of Review

Plaintiff, Gloria J. Bryant, ("Bryant"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), widow's insurance benefits based on disability, ("DWIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 402(e), 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

514, 517 (4ᵗʰ Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4ᵗʰ Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4ᵗʰ Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Bryant protectively filed applications for DIB and DWIB on June 17, 2018, and for SSI on December 4, 2018, alleging disability as of May 25, 2018, based on lumbar narrowing with nerve impingement; pain in the right hip due to sciatica; leg numbness; constant shaking; major anxiety; panic attacks; bi-polar manic depression; insomnia and difficulty concentrating. (Record, ("R."), at 15, 194-95, 198-99, 205-09, 274, 302, 311.) The claims were denied initially and upon reconsideration. (R. at 82-83, 87-89.) Bryant then requested a hearing before an administrative law judge, ("ALJ"). (R. at 93-94.) The ALJ held a hearing on November 19, 2019, at which Bryant was represented by counsel. (R. at 36-65.)

By decision dated December 3, 2019, the ALJ denied Bryant's claims. (R. at 15-29.) The ALJ found Bryant was the unmarried widow of the deceased insured worker and had attained the age of 50; thus, she met the nondisability requirements for disabled widow's benefits. (R. at 18.) To qualify for DWIB, however, the ALJ found Bryant had to show that she became disabled prior to March 31, 2020. (R. at 18.) The ALJ found Bryant met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2023.[2] (R. at 18.) The ALJ found that

---

[2] Therefore, Bryant must show she was disabled between May 25, 2018, the alleged onset date, and December 3, 2019, the date of the ALJ's decision, in order to be entitled to DIB benefits.

Bryant had not engaged in substantial gainful since May 25, 2018, her alleged onset date. (R. at 18.) The ALJ determined that Bryant had severe impairments, namely lumbar degenerative disc disease; obesity; bipolar disorder; and anxiety, but he found she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) The ALJ found Bryant had the residual functional capacity to perform light[3] work that required no more than frequent climbing of ramps and stairs, kneeling, crouching and crawling; no more than occasional climbing of ladders, ropes or scaffolds, balancing, stooping, working at unprotected heights and interaction with supervisors, co-workers and the public; and which required the performance of no more than simple, routine tasks with simple, short instructions and simple decisions in a low-stress work setting, which was defined as having only occasional workplace changes. (R. at 21.) The ALJ found Bryant was unable to perform any past relevant work. (R. at 27.) However, based on Bryant's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Bryant could perform, including the jobs of an assembler, a packer and an inspector/tester. (R. at 27-28.) Thus, the ALJ concluded Bryant was not under a disability as defined by the Act and was not eligible for DIB, DWIB or SSI benefits. (R. at 29.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2020).

After the ALJ issued his decision, Bryant pursued her administrative appeals, (R. at 177-79), but the Appeals Council denied her request for review. (R. at 1-5.)

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2020).

Bryant then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2020). This case is before this court on Bryant's motion for summary judgment filed February 15, 2021, and the Commissioner's motion for summary judgment filed March 16, 2021.

## *II. Facts*

Bryant was born in 1966, (R. at 194), which at the time of her alleged onset date and the time of the ALJ's decision, classified her as a "person closely approaching advanced age" under 20 C.F.R. §§ 404.1563(d), 416.963(d). She has an associate's degree and specialized training as a certified nurse's assistant, ("CNA"). (R. at 41, 275.) Bryant has past work experience as a customer service representative at a call center; a fast food manager; a fast food manager/fast food cook; a CNA; and a cashier. (R. at 59-60.) Bryant testified that, because she experienced back problems and arthritis in her knees while working in the fast food industry, she decided to get a sit-down job. (R. at 46.) She began working as a call center customer service representative, but began having daily panic attacks after about three months, which felt like a heart attack. (R. at 46.) Eventually, she had a "total meltdown," after which she could not return to work. (R. at 46.) According to Bryant, it was her mental issues that interfered with this job. (R. at 50.) She stated she got to a point she was afraid to answer a call and would avoid calls at all costs. (R. at 50-51.) Bryant testified one day it felt like her cubicle started closing in, and she could not breathe, she broke out in a sweat, and her face turned pale. (R. at 51.) She had to leave work, and eventually went to the emergency department because she thought she was having a heart attack. (R. at 51.) According to Bryant, she could hardly leave her bedroom because being around people made her nervous, and her chest would start to close. (R. at 47.)

Although she had allowed a former neighbor to move in with her, she said they both stayed in their rooms. (R. at 48.) Bryant testified she had no friends and did nothing social on a regular basis, although she used to go out before she began having panic issues. (R. at 48-49.) She said she sometimes still had panic attacks since she stopped working and did not know what caused them. (R. at 49.) However, she stated medicine helped. (R. at 49.) Bryant stated her son or daughter-in-law ran errands for her. (R. at 48.)

Bryant testified she had constant, throbbing lower back pain due to osteoarthritis that radiated into her hips. (R. at 51-52.) She said she had undergone physical therapy for her back, but she stopped going because it worsened her pain. (R. at 47.) However, Bryant stated she could not return to the neurosurgeon until she completed therapy. (R. at 47.) She also said Medicaid would not pay for a TENS unit prescribed by her neurosurgeon. (R. at 47.) Bryant further stated the neurosurgeon wanted to "put a needle in [her] back," which scared her. (R. at 47.) She said her legs had begun to shake constantly over the prior couple of months, which she attributed to restless leg syndrome. (R. at 52.) Although the doctor had prescribed Requip, she had been taking it for only two to three weeks, and it had not yet made a difference. (R. at 52.) Bryant also testified she had undergone two arthroscopic surgeries on her knees. (R. at 54.) Bryant said she took Lasix for knee swelling, and although her ankles also had begun swelling badly, she had not spoken with her doctor about this. (R. at 54.) Bryant stated she did not have difficulty standing or walking for any length of time before her legs became shaky. (R. at 52-53.) However, she estimated she could not stand long enough to vacuum her living room or to wash dishes without taking a break. (R. at 53.) Bryant estimated she could sit for 20 to 30 minutes before having to shift positions due to hip pain. (R. at 53.) She testified some days were better than others, noting her back hurt so badly

sometimes, she could not get up. (R. at 54-55.) At the time of the hearing, she testified she was five feet, four inches tall and weighed 240 pounds. (R. at 41.) Bryant further testified her mental impairments kept her in bed some days because she did not want to talk to anyone, be around anyone or do anything. (R. at 55.) She estimated she was staying in bed four or five days weekly. (R. at 55, 56.) Bryant testified her children had become worried about her after she had fallen down stairs due to leg numbness. (R. at 55.) She said they also worried about her mental health and that she might hurt herself, which Bryant denied. (R. at 56.) Bryant said her daughter, who did not live nearby, wanted her to move in with her. (R. at 55.) She said she had difficulty remembering things and concentrating. (R. at 56.) Bryant testified she would have problems being around co-workers and the public, as well as supervisors, because she was used to being the boss. (R. at 57.)

John Newman, a vocational expert, also was present and testified at Bryant's hearing. (R. at 58-64.) Newman testified that a hypothetical individual of Bryant's age, education and work experience, who could perform light work that required no more than six hours each of sitting, standing and walking; no more than frequent climbing of ramps and stairs, kneeling, crouching and crawling; no more than occasional climbing of ladders, ropes or scaffolds, balancing, stooping, working at unprotected heights and interacting with supervisors, co-workers and the public; and who could perform no more than simple, routine tasks with simple, short instructions, simple decisions and in a low-stress work setting, defined as having only occasional workplace changes, could not perform any of Bryant's past relevant work. (R. at 60-61.) However, he testified that such an individual could perform other jobs existing in significant numbers in the national economy, including those of an assembler, a bagger, and a sorter. (R. at 61.) Newman next testified that the same individual, but who could stand and walk for four hours each, and who could

perform all postural activities occasionally, could not perform any of Bryant's past relevant work, but could perform the sedentary[4] jobs of a final assembler, a stuffer and a dowel inspector, all existing in significant numbers. (R. at 61-64.) Finally, Newman testified that the same individual, but who would be off task 15 percent of the workday, and who would be absent from work two days monthly, could perform no work. (R. at 62-63.)

In rendering his decision, the ALJ reviewed medical records from Louis Perrott, Ph.D., a state agency psychologist; Dr. Daniel Camden, M.D., a state agency physician; Stephanie Fearer, Ph.D., a state agency psychologist; Dr. Richard Surrusco, M.D., a state agency physician; Norton Community Hospital; Pikeville Medical Center; Mountain View Regional Medical Center, ("Mountain View"); Johnson City Medical Center; Whitney B. Mays, N.P.; Mountain States Medical Group OB/GYN; Dr. Eddie Brown, D.O.; Melinda M. Fields, Ph.D.; BHMA Urgent Care Norton; Crystal Burke, L.C.S.W.; Appalachia Family Health; Wellmont Urgent Care; Wellmont Medical Associates; and East Tennessee Brain and Spine.

On May 30, 2018, Bryant presented to the emergency department at Mountain View with complaints of left chest pain radiating into the back. (R. at 515.) On examination, she was fully oriented and in no distress; she had a regular heart rhythm with a soft 2/6 systolic ejection murmur; pulmonary findings were normal; she had a normal range of musculoskeletal motion; and she had a normal mood, affect and behavior. (R. at 517.) A chest x-ray showed no acute cardiopulmonary

---

[4] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2020).

abnormalities, lab work was negative, and an EKG yielded normal results. (R. at 519-20, 530, 547.) Bryant was diagnosed with unspecified chest pain and discharged in good condition with Flexeril. (R. at 520, 545.)

On May 31, 2018, Bryant saw Whitney B. Mays, N.P., a nurse practitioner at Wellmont Medical Associates, reporting worsening back pain, which she described as right-sided and radiating down the right leg. (R. at 707.) She also stated her anxiety was worsening. (R. at 707.) Mays noted Bryant also suffered from bipolar disorder, but stopped taking Prozac, which had worked for her. (R. at 707.) Bryant had a normal range of motion of the neck; normal cardiovascular and pulmonary findings; decreased range of motion and tenderness in the lumbar back; normal reflexes; and she was fully oriented with a normal mood, affect, behavior, judgment and thought content. (R. at 708.) Mays diagnosed bipolar affective disorder, mixed, mild; anxiety; and right-sided sciatica. (R. at 708.) She restarted Bryant on Prozac, and she excused her from work until June 4, 2018. (R. at 708, 710.) A lumbar MRI dated June 14, 2018, showed no acute bony lesions; significant degenerative bulging annulus and facet arthropathy at the L5-S1 level, causing significant bilateral foraminal narrowing and mild compromise of the thecal sac; facet arthropathy causing minimal bilateral foraminal narrowing at the L3-L4 level; and bulging annulus and facet arthropathy at the L4-L5 level, causing minimal compromise of the thecal sac and mild bilateral foraminal narrowing. (R. at 582.) When Bryant saw Mays later that day, she requested a referral to neurosurgery for worsening back pain. (R. at 704.) She also requested an increased Prozac dosage, as it was helping. (R. at 704.) Bryant's examination was unchanged, and Mays diagnosed insomnia; anxiety; chronic, bilateral, low back pain with bilateral sciatica; and foraminal stenosis of the lumbosacral region. (R. at 705.) She prescribed Voltaren and referred Bryant to a neurosurgeon. (R. at 705.)

On September 29, 2018, Bryant saw Dr. Eddie Brown, D.O., for a consultative physical evaluation. (R. at 624-28.) Bryant's blood pressure was elevated at 145/74. (R. at 624-25.) She reported having back pain for approximately one year with no triggering event, which she rated as a four on a 10-point scale. (R. at 624.) She reported it occasionally radiated down the right leg and was worsened with excessive activity, sitting and standing for long periods and improved with getting in the fetal position and taking Voltaren. (R. at 624.) Bryant reported independence with activities of daily living. (R. at 624.) On examination, her gait was normal, and she ambulated without assistance; grip strength was 5/5 with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally; there was no edema, cyanosis or erythema of the extremities; motor tone and strength were full in all muscle groups, bilaterally; reflexes were normal; sensation was intact; Romberg's sign was negative; finger-to-nose, heel-to-shin and rapid alternating movements were intact and without fatigue; she had no muscle asymmetry, atrophy or involuntary movements; there was no structural deformity, effusion, periarticular swelling, erythema, heat or swelling of any joint; she could sit in no significant distress, walk and stand in the office; there were some obvious signs of joint tenderness in the lumbar spine, but no signs of joint instability, joint inflammation or joint deformity; musculoskeletal range of motion was normal; straight leg raise testing was positive, bilaterally; and Lachman's, anterior/posterior draw, valgus and varus testing all were negative. (R. at 625-26, 628.) Bryant was fully oriented and cooperative; she did not appear anxious or depressed; she was able to communicate without deficits; she was able to hold a conversation, respond appropriately to questions and remember instructions; recent and remote memory were intact; and she had good insight and cognitive function. (R. at 626.) Dr. Brown diagnosed lumbar radiculopathy. (R. at 626.) He opined Bryant was unlikely to be able to walk and/or stand for a full workday, but she may be able to sit for a partial workday with

allotted occasional breaks. (R. at 626.) Dr. Brown limited Bryant to lifting or carrying less than 10 pounds, as he opined her condition may be exacerbated by lifting or carrying excessive weight, and he limited her from excessive bending, stooping and crouching. (R. at 626.)

On November 1, 2018, Melinda M. Fields, Ph.D., a licensed psychologist, completed a consultative psychological evaluation of Bryant at the request of Disability Determination Services. (R. at 630-35.) Bryant reported initial mood-related symptoms dating back 25 years and a prior diagnosis of bipolar disorder. (R. at 631.) She stated her first panic attack occurred approximately 10 years previously, but they had worsened since the spring of 2018, as had her depressive symptoms. (R. at 631.) Bryant described a history of mood swings, racing thoughts and episodes of increased energy with inability to sleep, and she reported increasing irritability and withdrawal, feelings of hopelessness and worthlessness, decreased appetite with weight loss and passive suicidal ideation without plan or intent. (R. at 631.) Bryant denied psychotic processes, but she did report panic attacks that felt like she was having a heart attack, and which necessitated emergent treatment. (R. at 631.) She denied a history of inpatient psychiatric/psychological treatment, but she reported being in outpatient psychiatric treatment for three years. (R. at 632.) Bryant reported spending the majority of her time in her bedroom playing solitaire and watching television. (R. at 631.) She also stated she would check Facebook, but her interactions with others were seldom, stating, "I don't really have friends." (R. at 631.) She managed her own personal hygiene, she and her grown children did the grocery shopping, she prepared her own convenience foods, and she managed her own finances when she was employed. (R. at 631.) Bryant denied involvement in church, civic or community activities, and she described her social functioning as impaired. (R. at 631.) She said her husband of 30 years died five years previously,

and she denied involvement in a dating relationship. (R. at 633.)

Bryant had adequate hygiene and grooming; she was pleasant and cooperative, and she appeared to put forth good effort; she had no difficulty comprehending questions; she had adequate eye contact; she spontaneously generated a great deal of conversation in a loud, pressured fashion; stream of thought was organized and logical; there was no evidence of a thought content impairment, hallucinations or delusions; mood appeared anxious, with nervous laughter, fidgeting, leg movement and rubbing her hands on her thighs, hand wringing and tearfulness; affect was broad; she was fully oriented; judgment was adequate; immediate, recent and remote memory were intact; insight was adequate; she had difficulty with concentration, evidenced by her performance on Serial 3s; persistence and pace were normal; social functioning appeared impacted by her anxious mood; she had normal posture; and she had a slowed gait with discomfort standing from a seated position. (R. at 630, 633-34.) Fields diagnosed panic disorder and unspecified bipolar and related disorder, and she deemed Bryant's prognosis guarded. (R. at 634.) Fields further noted Bryant reported current depressive symptoms, consistent with a major depressive episode. (R. at 634.) She opined Bryant possibly would experience difficulty completing a typical workweek due to psychiatric symptoms. (R. at 634.) She further opined she possibly would experience an exacerbation in symptoms if faced with stressors typically encountered in gainful employment, including the need to interact in an appropriate manner on a regular basis with supervisors, co-workers or the public. (R. at 634.)

Louis Perrott, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), of Bryant on November 8, 2018, finding she was mildly limited in her ability to understand, remember or apply information and

to adapt or mange herself; and moderately limited in her ability to interact with others and to concentrate, persist or maintain pace. (R. at 69.) Perrott also completed a mental residual functional capacity assessment, finding Bryant had no understanding and memory limitations, as well as no adaptation limitations. (R. at 71-72.) He found she was moderately limited in her ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to interact appropriately with the general public; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 71.) Otherwise, Perrott opined Bryant was not significantly limited. (R. at 71.) He concluded that Bryant could understand and remember simple instructions, concentrate and persist at completing simple, routine tasks, interact appropriately in superficial, low-stress relationships and follow usual work routines, schedules and procedures. (R. at 72.)

Also on November 8, 2018, Dr. Daniel Camden, M.D., a state agency physician, completed a physical residual functional capacity assessment of Bryant, finding she could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently climb ramps and stairs, kneel, crouch and crawl; and occasionally climb ladders, ropes and scaffolds, balance and stoop. (R. at 70-71.) Dr. Camden imposed no manipulative, visual, communicative or environmental limitations. (R. at 70.)

On November 16, 2018, Stephanie Fearer, Ph.D., a state agency psychologist, completed another PRTF of Bryant, which mirrored the findings of Perrott. (R. at 76-77.) Fearer also completed a mental residual functional capacity assessment of

Bryant, which was substantially similar to that of Perrott. Fearer found Bryant was moderately limited in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 78-80.) Otherwise, Fearer opined Bryant was not significantly limited. (R. at 78-79.) Fearer concluded that the medical evidence of record showed that, despite the limitations assessed, Bryant retained the ability to perform simple, routine work with limited contact with the public. (R. at 79.)

Also on November 16, 2018, Dr. Richard Surrusco, M.D., a state agency physician, completed a physical residual functional capacity assessment of Bryant, which mirrored that of Dr. Camden. (R. at 77-78.)

On January 7, 2019, Bryant returned to Mays, again reporting her back pain was worse. (R. at 699.) However, she stated she never saw the neurosurgeon, and she wished to be referred again. (R. at 699.) On examination, Bryant had normal cardiac and pulmonary findings; she had tenderness and decreased range of motion of the lumbar back; and she was fully oriented with a normal mood, affect, behavior, judgment and thought content. (R. at 700.) Mays referred Bryant to neurosurgery. (R. at 701.) On January 22, 2019, Bryant reported fluctuating blood pressure, as well as intermittent, bilateral leg swelling and coughing and wheezing for the previous week. (R. at 694.) The only change in examination findings was wheezing. (R. at

695.) Mays diagnosed mild, intermittent asthmatic bronchitis with exacerbation, for which she prescribed albuterol and prednisone, and she also diagnosed lower extremity edema, for which she prescribed Lasix and potassium chloride. (R. at 696.) On February 5, 2019, Bryant stated Prozac was helping, but she still had mood swings. (R. at 690.) Examination was completely normal, including musculoskeletal findings. (R. at 692.) Mays diagnosed chronic bipolar disorder, for which she prescribed Abilify. (R. at 692.)

On February 5, 2019, Bryant saw Crystal Burke, L.C.S.W., a licensed clinical social worker at Appalachia Family Health, to establish behavioral health care. (R. at 723.) She reported problems with depression and a diagnosis of bipolar disorder more than 20 years previously. (R. at 723.) Bryant said she had been in outpatient treatment previously and had been treated with Depakote and Zoloft. (R. at 723.) She reported she began having severe panic issues while working at the call center, which necessitated her quitting. (R. at 723.) She stated she had become very withdrawn and isolated. (R. at 723.) Bryant stated she had been taking Prozac for a couple of years, but she did not think it helped very much. (R. at 723.) She said she was running a small diner her children had opened when they became too busy to do it. (R. at 723.) However, she stated the business closed because she could not do the work alone. (R. at 723.) Bryant stated her grandchildren currently were staying with her, which gave her a sense of purpose, but some of them would be moving out soon. (R. at 723.) She said she spent much of her time in her bedroom and had lost interest in activities. (R. at 723.) Bryant reported her back pain also contributed to her depression. (R. at 723.) On mental status examination, Bryant's appearance/grooming was clean, neat and casual; mood and affect were mildly anxious; eye contact was adequate; she was fully oriented; thought process was rambling; judgment and insight were fair; and there were no paranoia, delusions or

-14-

suicidal ideations. (R. at 724.) Burke diagnosed major depressive disorder, recurrent, severe without psychotic features; and unspecified anxiety disorder. (R. at 724.)

On February 12, 2019, Bryant complained of sinus pressure and drainage for the previous week, and her blood pressure was elevated at 190/84. (R. at 682-83.) Examination findings were normal, except for a runny nose and sinus tenderness. (R. at 683.) Mays diagnosed bacterial sinusitis and benign hypertension, and she prescribed Amoxil and Benicar. (R. at 684.) On March 12, 2019, although Bryant's blood pressure had improved, it still was not to "goal." (R. at 670.) She reported difficulty sleeping and wished to try Elavil. (R. at 670.) She stated Abilify and Prozac were helping her moods. (R. at 670.) No physical examination findings were recorded on this date, but Mays added Elavil and Norvasc to Bryant's medication regimen. (R. at 671-72.)

Bryant presented to BHMA Urgent Care Norton, ("Urgent Care"), on February 28, 2019, with complaints of a possible abdominal skin abscess. (R. at 658.) On examination, she was alert and fully oriented; there was no edema, cyanosis or clubbing of the extremities; and she had 5/5 strength, normal range of motion and no swollen or erythematous joints; but she had an area of exquisite tenderness to palpation and erythema on the right side of the lower abdomen with mild warmth and a small central ulceration. (R. at 659-60.) Bryant was diagnosed with a cellulitic reaction to a probable insect bite. (R. at 660.) She received a steroid injection and was given Keflex. (R. at 660.) Bryant returned to Urgent Care on March 5, 2019, at which time the abscess was drained, a Toradol injection was administered, and Bactrim was prescribed. (R. at 653-54.) On March 8, 2019, the wound appeared to be doing well, and it was repacked and dressed. (R. at 638, 640.) At that time, Bryant had a normal range of musculoskeletal motion; the abscess was well-healing; she

was alert and fully oriented; and her mood, affect, speech and behavior were normal. (R. at 641-42.)

Bryant saw Steven McLaughlin, P.A., a physician assistant at East Tennessee Brain and Spine, on March 11, 2019, for complaints of back pain with leg numbness. (R. at 779.) Her weight was recorded at 252 pounds, yielding a BMI of 43.26. (R. at 780.) Bryant had normal range of motion of the extremities with no edema; tenderness in the low back; no sacroiliac, ("SI"), joint tenderness, and range of motion was not severely limited; gait was nonantalgic; full strength with no focal weakness; unremarkable sensation; knee reflexes were 2 and symmetric, and ankle reflexes were 1-2 and symmetric; straight leg raise testing was negative; and there was no clonus of either ankle. (R. at 780.) McLaughlin noted axial low back pain with probable bilateral L5 radiculitis and fairly significant spondylosis at the L5-S1 level with bilateral foraminal narrowing, but no fixed lumbar radiculopathy. (R. at 780.) He diagnosed chronic, bilateral low back pain with bilateral sciatica, and he referred Bryant to physical therapy to address her lumbar spondylosis. (R. at 780.) McLaughlin also counseled Bryant significantly on weight loss, noting his belief this was contributing to her problem, along with smoking. (R. at 781.) When McLaughlin stated she probably could manage her problem with weight loss and smoking cessation, she advised she was beginning a smoking cessation plan, and she intended to lose weight. (R. at 781.) She further stated she "in no way wants to ever pursue any surgical intervention for this problem." (R. at 781.) He noted that he might consider facet blocks or an epidural steroid injection if physical therapy did not improve her condition. (R. at 781.)

Bryant continued treating with Mays through October 2019. Over this time, she continued to complain of worsened back pain, as well as joint pain, restless legs,

arthritis and anxiety. (R. at 663, 769.) In October 2019, she stated she could not stand for long periods of time due to pain, but she reported her blood pressure was controlled. (R. at 769.) Examinations yielded largely normal findings, except for lumbar tenderness and decreased range of motion. (R. at 664, 770-71.) Mays diagnosed bilateral sciatica; arthralgia of an unspecified joint; malaise and fatigue; hypertension; and restless leg syndrome. (R. at 664.) She administered a Toradol injection and prescribed steroids and Requip. (R. at 665, 771.) Rheumatoid factor, anti-nuclear antibody and sedimentation rate testing was negative. (R. at 665-69.) Mays completed a physical assessment of Bryant on October 25, 2019, finding she could lift and/or carry up to 20 pounds occasionally and up to 15 pounds frequently; stand and/or walk for a total of less than one hour in an eight-hour workday, as well as without interruption; frequently balance; and never climb, stoop, kneel, crouch and crawl. (R. at 773-75.) Mays found Bryant's ability to push/pull was affected by her impairment, while her ability to sit was not, and she had no environmental restrictions. (R. at 774-75.) Mays opined Bryant would be absent more than two workdays monthly. (R. at 775.)

Bryant also continued mental health treatment with Burke and Martin through October 2019. Over this time, she reported continued sleep issues, self-isolation and problems with mood, anxiety, depression and panic. (R. at 719, 727, 764, 782.) In March and April 2019, she reported rarely leaving her house or bedroom due to anxiety. (R. at 714, 719.) However, in April 2019, she said a friend had moved in with her for a while, and she would watch some television with her and her grandchildren. (R. at 714.) Also in April 2019, Bryant advised Martin of excessive cleaning and checking doors. (R. at 727.) By the end of September 2019, Bryant told Burke she had spent a couple of months with her daughter and grandchildren in Richmond and planned to return there in a couple of weeks. (R. at 764.) In October

2019, she confirmed she had been back to visit, and she was considering moving there, as she missed her grandchildren, and her panic attacks were not as bad when her daughter was around. (R. at 782.) At that time, she advised Martin she was doing "pretty good," except she was not sleeping well. (R. at 791.) Over this time, Bryant reported quilting and knitting in an effort to work on her focus. (R. at 719, 764, 782.) Although her daughter wanted her to participate in a craft fair, the thought of being in a crowd took her breath away. (R. at 764.)

Mental status examinations over this time continued to reflect that Bryant exhibited inappropriate giggling; her mood ranged from euthymic to anxious to hypomanic[5] to mixed; thought process was described as racing, scattered and rambling on occasion; and speech was rapid and tangential on one occasion. (R. at 717, 720, 733-34, 766-67, 784-85, 791-92.) Otherwise, she had a normal appearance/grooming; adequate eye contact; full orientation; fair judgment and insight; unremarkable motor movements; good articulation; average intellect; and no paranoia, delusions or suicidal ideations. (R. at 717, 720, 733-34, 766-67, 784-85, 791-92.) Additional diagnoses over this time included other symptoms and signs involving emotional state; unspecified insomnia; irritability and anger; other stressful life events affecting family and household; and unspecified mood disorder. (R. at 720, 733, 766, 792.) She was continued on Prozac, Abilify and an increased dosage of Elavil. (R. at 734, 793.)

Burke completed two mental assessments of Bryant over this time – one on

---

[5] Hypomania is an abnormality of mood resembling mania (persistent elevated or expansive mood, hyperactivity, inflated self-esteem, etc.) but of lesser intensity. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 805 (27th ed. 1988).

May 3, 2019, and another on October 31, 2019. (R. at 711-13, 776-78.) In the May 3, 2019, assessment, Burke opined Bryant was markedly[6] limited in her ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment in public, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention/concentration, to understand, remember and carry out complex job instructions and to behave in an emotionally stable manner. (R. at 711-13.) She found Bryant was moderately[7] limited in her ability to understand, remember and carry out simple and detailed job instructions, to maintain personal appearance, to relate predictably in social situations and to demonstrate reliability. (R. at 712.) Burke also found Bryant would be absent from work more than two days monthly due to her impairments or treatment. (R. at 713.) The October 31, 2019, assessment was a bit less limiting, but substantially similar. Burke's findings remained the same, except, instead of finding a moderate limitation in the ability to maintain personal appearance she found a mild[8] limitation, and instead of a marked limitation in the ability to follow work rules and to function independently, she found moderate limitations. (R. at 776-78.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This

---

[6] This assessment defines a marked limitation as a serious limitation and substantial loss in the ability to effectively function, resulting in unsatisfactory work performance. (R. at 711.)

[7] This assessment defines a moderate limitation as more than a slight limitation, but the individual still can function satisfactorily. (R. at 711.)

[8] This assessment defines a mild limitation as a slight limitation, but the individual still can generally function well. (R. at 776.)

process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Bryant argues that the ALJ erred by improperly determining her residual functional capacity by rejecting the opinions of Dr. Brown, Burke and Mays. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) Bryant also contends the ALJ should have applied Rule 201.04[9] of the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, ("the Grids"), to find her disabled. (Plaintiff's Brief at 7.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[10]

---

[9] Rule 201.04 of the Grids applies to individuals limited to sedentary work. Based on my subsequent findings, I find this argument is moot.

[10] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental, or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. §§ 404.1513(a)(5), 416.913(a)(5)

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. §§ 404.1520c(b), (c)(1)-(5), 416.920c(b), (c)(1)-(5) (2020) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (2020).[11] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim,

---

(2020).

[11] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1) "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

the more persuasive the medical opinion(s) … will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he or she considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. §§ 404.1520c(b)(2)-(3), 416.920c(b)(2)-(3) (2020).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well at the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. §§ 404.1520c(b)(3), (c)(3)-(5), 416.920c(b)(3), (c)(3)-(5).

A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a) (2020). The ALJ found that Bryant had the residual functional capacity to perform light work that required no more than frequent climbing of ramps and stairs, kneeling, crouching and crawling; no more than occasional climbing of ladders, ropes or

scaffolds, balancing, stooping, working at unprotected heights and interacting with supervisors, co-workers and the public; and which required the performance of no more than simple, routine tasks with simple, short instructions and simple decisions in a low-stress work setting, which was defined as having only occasional workplace changes. (R. at 21.) In making this residual functional capacity finding, the ALJ stated he found the opinions of Dr. Brown and Mays, regarding Bryant's physical impairments and limitations, "not persuasive." (R. at 26.) Specifically, Dr. Brown opined Bryant unlikely was able to walk and/or stand an entire workday; she may be able to sit for a partial workday with allotted occasional breaks; she was limited to lifting/carrying less than 10 pounds because her condition may be exacerbated by lifting or carrying excessive weight; and she was precluded from excessive bending, stooping and crouching. (R. at 626.) The ALJ found this opinion was not supported by Dr. Brown's own findings. (R. at 26.) In particular, while the ALJ noted Dr. Brown's findings of lumbar tenderness and positive straight leg raise testing, which might support some lifting and/or carrying limitations, the ALJ further noted that other portions of Dr. Brown's examination findings were completely normal, including, among other things, a normal gait, full grip strength, adequate fine motor movements, the ability to bilaterally grasp objects, no muscle atrophy and no joint instability. (R. at 22, 26.) Additionally, the ALJ found Dr. Brown's opinion was not consistent with the other evidence of record, noting that, contrary to his findings, McLaughlin, the neurosurgical treatment provider, found negative straight leg raise testing, and he opined that much of Bryant's pain was related to her obesity and smoking. (R. at 26, 780-81.) In fact, McLaughlin advised Bryant he felt her back pain could be managed by addressing these issues. (R. at 25, 26, 781.) Moreover, for the reasons that follow, the ALJ noted that Dr. Brown's opinion also was not consistent with Mays's treatment notes.

As stated above, the ALJ also found Mays's opinion "not persuasive." (R. at 26.) She opined, in an October 2019 physical assessment, that Bryant could perform light-level lifting/carrying amounts, but she limited Bryant to less than one hour of standing/walking in an eight-hour workday due to back pain and leg weakness. (R. at 26, 773.) Mays did not limit Bryant's sitting ability, but she opined the only postural function she could perform was frequent balancing. (R. at 26, 774.) Mays further opined Bryant would miss more than two workdays monthly. (R. at 26, 775.) The ALJ found that Mays's standing and walking limitations, as well as her finding that Bryant could not stoop or crouch at all, were inconsistent with her finding that Bryant retained a light-level lifting/carrying ability. (R. at 26.) Moreover, the ALJ noted that Mays's own treatment records, which reflected only lumbar tenderness and reduced range of motion, did not support such harsh limitations. (R. at 26.) Additionally, the ALJ found that Mays's opinion was inconsistent with the treatment notes of the neurosurgical provider, McLaughlin, who did not think the primary cause of Bryant's back pain was her spinal issues, thereby indicating she was not mechanically limited. (R. at 26.) Instead, as stated above, McLaughlin opined that Bryant's back pain could be managed with weight loss and smoking cessation. (R. at 781.) While McLaughlin did refer Bryant to physical therapy, noting if that did not improve her condition, she could undergo facet blocks or an epidural steroid injection, there are no physical therapy notes contained in the record, and Bryant testified at her hearing that she was afraid to undergo injections. (R. at 47, 780-81.)

Instead, the ALJ found the opinions of the state agency physicians, Drs. Camden and Surrusco, who found Bryant could perform light work that required no more than frequent climbing of ramps and stairs, kneeling, crouching and crawling; and no more than occasional climbing of ladders, ropes and scaffolds, balancing and stooping, persuasive. (R. at 25, 70-71, 77-78.) Specifically, the ALJ stated Drs.

Camden and Surrusco gave Bryant similar limitations as were contained in his ultimate residual functional capacity finding. (R. at 25.) In his decision, the ALJ stated that the record did not indicate Bryant suffered from intense back pain, as she rated her pain a four on a 10-point scale during the physical consultative examination. (R. at 25, 624.) He further stated she was not interested in surgery, and, while this was partly due to anxiety, the ALJ found it also was an indication she did not feel overly limited. (R. at 25.) The ALJ also stated Bryant testified to lifting 35 pounds at times in her most recent fast food job, which is more than the light exertional level, and she did not quit her sedentary customer service job in May 2018 due to physical issues, indicating at least intact sitting ability. (R. at 21, 25.) Moreover, the ALJ noted that Bryant reported she tried working in a restaurant business, and, although she stopped due to back pain, this job would have involved significant exertional activity. (R. at 25.) He stated the evidence indicated Bryant would not have greatly reduced ambulation, and she would be able to carry at the light level and lift at least at this level. (R. at 25.)

Regarding Bryant's mental limitations, the ALJ stated that Bryant had reported both social anxiety and social withdrawal, but he further noted she had worked around groups of people in the past, and she did not indicate social anxiety being a primary reason she left her most recent fast food job. (R. at 26.) Instead, she stated she left that job due to her back issues. (R. at 21.) While Bryant did indicate she left the call center job due to psychiatric issues after suffering a panic attack, the ALJ noted that this job entailed a high level of interactions with people, and she was being heavily monitored by her supervisors in those interactions. (R. at 26.) The ALJ further stated Bryant was not on her psychiatric medication at that time. (R. at 20.) The ALJ noted that, while Bryant's social anxiety might have worsened by her alleged onset date, even during the period at issue, she continued to go to the flea

market, and she reported running a diner during the relevant time period, all of which further indicate some tolerance for social interaction. (R. at 26.) Bryant also indicated she was able to babysit her grandchildren, shop in stores for up to an hour weekly, she cared for two dogs, she continued to drive, she played solitaire, and she could manage her finances, all of which require some degree of concentration. (R. at 284, 286, 631.) Moreover, the ALJ found that Bryant had performed skilled work in the past, indicating normal intelligence, and she did not exhibit significant memory issues during the psychological consultative examination. (R. at 19.) While she had racing thoughts at times from hypomania, her providers did not find disorganized thoughts, and she was able to exchange information with her providers, such as her discussion with her neurosurgical provider regarding treatment options for her back pain. (R. at 19.) Furthermore, although she had significant anxiety, depression and hypomania issues, with racing thoughts and giggling that did not match her mood or the conversation at times, she had not experienced hallucinations, delusions or psychiatric hospitalizations. (R. at 20.)

Burke completed two assessments in 2019, finding Bryant had marked limitations in the ability to maintain concentration, relate to others, deal with work stresses and maintain emotional stability and moderate limitations in the ability to understand, remember and carry out simple job instructions and to relate predictably in social situations. (R. at 711-13, 776-78.) Burke opined Bryant would be absent more than two workdays monthly. (R. at 713, 778.) The ALJ found Burke's opinions "not persuasive" because they were not supported by her treatment notes. (R. at 27.) Burke noted some hypomania during examinations. (R. at 27.) However, the ALJ found that hypomanic symptoms do not signal an inability to concentrate in less difficult work situations, and the treatment notes reflected that Bryant was able to function during the examination with only a note of the appearance of concentration

difficulty. (R. at 27.) Moreover, the ALJ noted that Bryant continued to be able to live independently and babysit her grandchildren, tasks requiring some amount of concentration. (R. at 20.) Although Fields indicated Bryant had some concentration difficulty with Serial 3s, the ALJ noted this did not indicate intense concentration difficulty, and Bryant's primary care provider did not note particular focus difficulties or intense psychological issues. (R. at 20.) Moreover, the ALJ noted that the physical consultative examiner did not note any particular mental health issues. (R. at 27.) Furthermore, while Bryant advised Burke she did not want to leave her house, or even her room, these treatment notes, nonetheless, reveal that she was motivated to visit her grandchildren who had moved to Richmond, on more than one occasion. (R. at 27.) Thus, the ALJ concluded Bryant's mental limitations were accommodated by a restriction to occasional social interaction and simple work, as contained in the residual functional capacity finding. (R. at 27.)

In addition to the reasons enumerated by the ALJ, the court further notes that Burke's opinions were contained in check-box forms, which this court has found are not entitled to great weight. *See Cooper v. Saul*, 2019 WL 6703557, at *10 (W.D. Va. Oct. 29, 2019) (citing *Gerette v. Colvin*, 2016 WL 1296082, at *6 (W.D. Va. Mar. 30, 2016) (form reports, in which a physician's only obligation is to check a box or fill in a blank, are entitled to little weight in the adjudication process); *Walker v. Colvin*, 2015 WL 5138281, at *8 (W.D. Va. Aug. 31, 2015) (check-box forms are of limited probative value); *Ferdinand v. Astrue*, 2013 WL 1333540, at *10 n.3 (E.D. Va. Feb. 28, 2013) (check-box forms are weak evidence at best); *Leonard v. Astrue*, 2012 WL 4404508, at *4 (W.D. Va. Sept. 25, 2012) (check-box assessments without explanatory comments are not entitled to great weight, even when completed by a treating physician)).

The ALJ found the opinions of the state agency psychologists, Perrott and Fearer, who found Bryant could handle simple instructions and simple, routine tasks, as well as superficial interactions and limited public contact, persuasive, as they were similar to his ultimate residual functional capacity finding. (R. at 27.) Similarly, the ALJ found the opinion of Fields, the consultative psychological examiner, that Bryant might experience difficulty with work and might experience exacerbation of symptoms with work stressors, including interacting with others, "partially persuasive." (R. at 27.) The ALJ noted that such statements were uncertain and vague, but the evidence did indicate Bryant would, in fact, experience some such issues. (R. at 27.) Based on the same evidence cited above, I find that the ALJ properly considered the opinions of the state agency psychologists and the consultative psychological examiner.

For all the above-stated reasons, I find that substantial evidence exists to support the ALJ's consideration of the medical evidence, as well as his residual functional capacity finding. An appropriate Order and Judgment will be entered.

DATED:     March 16, 2022.

/s/ *Pamela Meade Sargent*  UNITED STATES MAGISTRATE JUDGE